Matthew R. DiBlasi
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
Phone: (212) 513-3200
Fax: (212) 385-9010
matthew.diblasi@hklaw.com

*Attorneys for Plaintiff State Farm Mutual*
*Automobile Insurance Company & State*
*Farm Fire & Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY, <br><br>                           Plaintiffs, <br><br>     - against - <br><br> HERSCHEL KOTKES, M.D., P.C. and HERSCHEL KOTKES, M.D. <br><br>                     Defendants. | Plaintiffs Demand Trial By Jury <br><br> Civil Action No. _____ <br><br> COMPLAINT |

Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively "Plaintiffs"), by and through their undersigned attorneys, sue Herschel Kotkes, M.D., P.C. (the "Kotkes Practice") and Herschel Kotkes, M.D. ("Dr. Kotkes") (collectively "Kotkes" or "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover money fraudulently obtained from Plaintiffs for auto insurance benefits through the submission of bills and supporting documentation for services purportedly rendered to individuals involved in motor vehicle accidents who were eligible for no-fault insurance benefits ("No-Fault Benefits") under Plaintiffs' insurance policies (the "Insured(s)"

or "Patient(s)"). The bills and supporting documentation Kotkes submitted, or caused to be submitted, to Plaintiffs were fraudulent and misleading because, among other things, they represented the treatment was eligible for reimbursement and that the medical services recommended and performed were medically necessary, when they were not. Instead, the medical treatments were not tailored to the individualized complaints and needs of the Patients, but rather, were the product of a fraudulent predetermined treatment protocol ("Treatment Protocol") whereby Kotkes did not legitimately examine, diagnose, or treat the Patients, but instead, recommended and performed a uniform course of treatment designed to unlawfully exploit the Patients' No-Fault Benefits by maximizing the payments to Kotkes.

2.       Kotkes' Treatment Protocol involved initial examinations that were not performed to determine the true nature and extent of Patients' injuries, but rather, to justify substantially similar and in some cases nearly identical examination findings and a variety of medically unnecessary treatments and services. The Treatment Protocol also included a combination of medically unnecessary interventional procedures, including percutaneous discectomies, discographies, epidurographies, Intradiscal Electrothermoplasties ("IDETs"), epidural steroid injections ("ESIs") and trigger point injections performed on the Patients. Kotkes recommended and performed these interventional procedures regardless of the individual characteristics, injuries, or needs of the unique Patient. Kotkes then submitted medical documentation to Plaintiffs purporting to support  the need for the aforementioned Treatment Protocol, including examinations, injections and surgical procedures when, in fact, they were medically unnecessary. As a result, Patients were not legitimately examined, diagnosed, or properly treated for conditions they may have had, but instead, their limited No-Fault Benefits were depleted and rendered unavailable for legitimate treatment they may have needed.

3.     Plaintiffs seek to recover the amounts they paid to Kotkes based upon theories of fraud and unjust enrichment. Plaintiffs further seek a declaratory judgment confirming they are not legally obligated to pay reimbursement to Kotkes for any of Kotkes' pending and unpaid demands, bills, and/or invoices where Kotkes recommended and/or performed the Treatment Protocol on a Patient because such services were fraudulent, medically unnecessary, and unlawful.

4.     The evidence gathered by Plaintiffs indicates Kotkes' scheme began as early as 2017 (but may have commenced even earlier) and has continued uninterrupted since that time. Given Kotkes' actions, including but not limited to Kotkes' fraudulent misrepresentations and omissions, Plaintiffs did not, and could not have, uncovered the scheme until years later. As a result of Kotkes' scheme, Plaintiffs have incurred damages in excess of $550,000.00 in payments made to Kotkes, plus in excess of $3.1 million in unpaid and/or underpaid claims that comprise Plaintiffs' declaratory claim.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to the Declaratory Judgment Act, 28 U.S.C, §§ 2201 and 2202.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, Defendants reside and do business in this judicial district, and the conduct of the Defendants has resulted in actionable claims in this judicial district.

## PARTIES

### I.   Plaintiffs

7.      Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm Mutual") is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois. Accordingly, Plaintiff State Farm Mutual is a citizen of the State of Illinois. State Farm Mutual is licensed to engage in business in the State of New York as a foreign corporation and is doing business in Kings County and Nassau County, New York. State Farm Mutual issues automobile insurance policies in New York and made substantial insurance payments to, or for the direct benefit of, Kotkes.

8.      Plaintiff State Farm Fire and Casualty Company ("State Farm Fire") is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois. Accordingly, Plaintiff State Farm Fire is a citizen of the State of Illinois. State Farm Fire is licensed to engage in business in the State of New York as a foreign corporation and is doing business in Kings County and Nassau County, New York. State Farm Fire issues automobile insurance policies in New York and made substantial insurance payments to, or for the direct benefit of, Kotkes.

### II.   Defendants

9.      Herschel Kotkes, M.D., P.C. (or the Kotkes Practice) is a domestic professional corporation organized under the laws of New York, with its principal place of business in Cedarhurst, New York.  Accordingly, the Kotkes Practice is a citizen of the State of New York. The Kotkes Practice was incorporated on March 5, 2005 by Dr. Kotkes. The Kotkes Practice provides initial and follow-up evaluations, as well as injections and surgeries at multiple locations including, 77 North Centre Avenue, Suite 208, Rockville Centre, New York 11570 and 3824

Nostrand Avenue, Brooklyn, New York 11235 and provides surgical procedures at various surgical facilities.

10.     Herschel Kotkes, M.D., (License #221937) (or Dr. Kotkes) resides in New York. Dr. Kotkes is licensed to and practices medicine in New York and is the sole shareholder of the Kotkes Practice. Accordingly, Dr. Kotkes is a citizen of the State of New York.

## ALLEGATIONS COMMON TO ALL COUNTS

### I.      Claims for Payment Under the No-Fault Laws

11.     Plaintiffs issue automobile insurance policies in the State of New York.

12.     Under New York's Comprehensive Motor Vehicle Insurance Reparation Act (N.Y. Ins. §5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §65 et seq.) (collectively "No Fault Laws"), insurers are required to provide No-Fault Benefits to their policyholders and other eligible victims of automobile accidents.

13.     No-Fault Benefits include up to $50,000.00 per claimant/Insured for reasonable expenses incurred for medically necessary healthcare goods and services.

14.     New York's No-Fault Benefits laws are designed to ensure injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the medically necessary healthcare services they require.

15.     Insureds can assign their right to No-Fault Benefits to professional health service providers in exchange for medical services if those providers meet applicable New York State and local licensing requirements to perform such services in New York. With a duly executed direct assignment, a healthcare provider may submit claims directly to an insurance company and receive direct payment from an insurance company for necessary medical services rendered. Once the healthcare provider takes an assignment of an insureds' right, the provider cannot seek

to recover payment from the Insured. Kotkes obtained a direct assignment from the at-issue Insureds and submitted claims for payment directly to Plaintiffs.

16.     Pursuant to New York law, it is a crime for any person to submit a claim for insurance or statement of claim containing any materially false information. New York Insurance Law § 403(e), provides all claim forms must be verified by the healthcare provider subject to the following statement:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

17.     Under New York law, it is unlawful for a licensed physician to exercise undue influence on a patient, including the promotion or the sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party. *See* N.Y. Education Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

## II.     Plaintiffs' Car Policy

18.     Plaintiffs' New York Car Policy 9832A ("Policy") and its endorsements mandate Plaintiffs and its Insureds are only contractually obligated to pay for medical expenses that are medically "necessary" and related to or "caused by" the at-issue motor vehicle accident. *See* Policy, at 6291X. This Policy was in effect during the entire relevant time period.

19.     Insofar as Kotkes submitted, or caused to be submitted, claims for medical treatment that was not medically "necessary" and/or for purported injuries that were not caused by the at-issue motor vehicle accident, there is no coverage and Plaintiffs and its Insureds are not contractually obligated to pay those claims.

**III.**    **The Legitimate Treatment of Patients with Non-Specific Neck and Back Pain**

20.     Kotkes purports to examine, diagnose, and treat patients who are in motor vehicle accidents and complain of neck and back pain.

21.     A detailed history and a legitimate examination must be performed to arrive at a legitimate diagnosis for patients with neck and back pain resulting from motor vehicle accidents.

22.     Based upon a legitimate diagnosis, a licensed medical professional must engage in medical decision making to design a legitimate treatment plan tailored to the unique circumstances of each patient. During the course of treatment, treatment plans should be periodically reassessed and modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

23.     The decision of which, if any, types of medical treatments are appropriate for each patient should vary depending on the unique circumstances of each patient, including but not limited to: (a) the patient's age, social circumstances (*i.e.*, smoking, drinking, athletics), family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

24.     When a patient presents with a soft tissue or disc injury after an automobile accident, such as a sprain, strain, disc bulge, or herniation, conservative treatment should be recommended—which often times consists of a combination of rest, ice, compression and, if applicable, elevation of the affected body part. If that does not resolve the patient's symptoms, other conservative treatment modalities should be tried, such as chiropractic treatment, physical therapy, and/or the use of medication. Legitimate treatment plans for patients with strains, sprains, bulges, and herniations may involve no further treatment (or no treatment at all) because

these injuries are often resolved over a period of weeks through conservative care (or heal without any intervention).

25.     In a legitimate clinical setting, interventional pain management treatment should not be administered until a patient has failed conservative treatment. Invasive pain management treatments—such as injections and surgery—entail a degree of risk to the patient absent in conservative forms of treatment.

26.     Patients should be discharged from treatment when they have reached maximum medical improvement, which means no further treatment is likely to benefit the patient.

27.     The above-described process of examination, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation of this information; and (d) payors such as Plaintiffs so they can evaluate, and if appropriate, pay for reasonable and medically necessary treatment.

IV.     **The Treatment Protocol**

28.     Kotkes' medical services were neither reasonable, related, or medically necessary, but were furnished as a consequence of Kotkes' unlawful and fraudulent Treatment Protocol scheme designed to exploit the Patients' No-Fault Benefits. Instead of treating each Patient based on his or her needs, Kotkes collectively established and implemented a scheme by which they: (1) conducted sham initial evaluations that did not legitimately examine or diagnose the Patients or properly asses the Patients' medical histories and prior treatment; and (2) then recommended, and often performed, a series of medically unnecessary diagnostic procedures, injections, and surgeries—all geared toward exacting as much as possible from the Patient's No-

Fault Benefits without regard to the needs of the individual Patients. Kotkes' medical documentation of the examinations, diagnoses, and treatment plans was fraudulent because, among other things, the records did not accurately reflect the medical conditions and needs of the Patient, but instead contained pervasive and non-credible patterns designed to justify the performance of medically unnecessary interventional procedures in the form of injections and surgery, rather than to legitimately treat Patients for the medical conditions they may have had. Kotkes recommended and performed these interventional procedures pursuant to the Treatment Protocol to exploit the Patients' No-Fault Benefits.

29.     At the outset, Kotkes performed initial examinations on the Patient. Through these initial examinations, Kotkes diagnosed the Patients with conditions that varied little from Patient to Patient, regardless of the Patient's age, medical history, subjective complaints, treatment history, or the purported objective findings during these examinations. Kotkes then used these examinations as justification to prescribe the same or substantially the same predetermined Treatment Protocol for the Patients in the form of a combination of epidural steroid injections, trigger point injections, diagnostic procedures (*e.g.,* discographies, epidurographies), and surgical procedures (*e.g.,* percutaneous discectomies and IDETs).

30.     The frequency and uniformity of these procedure recommendations is not plausible given the type of injuries and the unique circumstances of each Patient. As stated above, neck and back injuries from minor motor vehicle accidents often heal without any intervention or treatment. To the extent the injuries do not heal on their own, patients should first be treated conservatively through a combination of medication, time, physical therapy, and/or chiropractic treatment. While some patients improve from conservative care, those who do not could potentially become candidates for epidural steroid injections or other non-invasive injection

therapies that are appropriate based on the patient's unique medical history, response to prior conservative treatment, physical condition, limitations and abilities, the location, nature, and severity of the patient's injury and symptoms, and any other unique considerations for the particular patient. If these same patients fail conservative care and do not experience a positive response from their injection therapy, then it is possible they may become appropriate candidates for surgical diagnostic procedures and treatments.

31.    Kotkes' medical documentation and reports for the injections and surgical procedures, and often follow-up evaluation reports (when done), reveal a lack of documentation of patient responses to the above-referenced treatment. This information should be included so the licensed professionals involved in the patient's care, other licensed professionals who may treat the patient contemporaneously or subsequently, the patients themselves, and payers can be fully informed about the success or failure of the procedures. This information is particularly critical to decisions about whether to subject patients to the risks of injections and surgical procedures initially, and certainly whether to continue with multiple rounds of injections and surgical procedures. Kotkes' records lack any meaningful information.

### A.    Kotkes' Initial Examinations

32.    As part of the Treatment Protocol, Kotkes purported to perform initial examinations on Patients.

33.    The documentation of the initial examinations, as well as the diagnoses and treatment recommendations contained therein ("Initial Report") are simply not credible, are misleading, and are fraudulent. *See* Treatment Summary, attached hereto as **Exhibit 1**.

34.    Kotkes did not perform legitimate examinations designed to determine the Patients' medical conditions or to allow Kotkes to create a medically reasonable and necessary

treatment plan for those conditions. Instead, Kotkes created Initial Reports with generic, non-specific, and over broad diagnoses and recommendations in an attempt to justify performing highly lucrative, but medically unnecessary treatment on the Patients.

35.     The Initial Reports contained prepopulated typed findings, standard diagnoses, and pre-determined boilerplate treatment plans without specifics as to how the particular Patient might benefit from a particular treatment or any indications that certain Patients were not candidates for certain medical procedures. The pervasive non-credible patterns in these Initial Reports coupled with the routine over-prescription of medically unnecessary injections and surgical treatment demonstrate the initial examinations were not done to legitimately advance the Patient's medical condition, but rather to extract as much as possible from the Patient's No-Fault Benefits.

### i. Complaints, Testing and Diagnoses

36.     As set forth in the Treatment Summary (**Exh 1**), the Initial Reports almost always described the Patients' complaints as non-specific neck and/or low back pain with correlating radiating pain in the same region(s), as opposed to specifically identifying problematic levels of the spine (*i.e.,* pain in L3-L4 region) that may need medical treatment. *See* Treatment Summary, (**Exh. 1**).[1] When Kotkes did identify spinal regions, they broadly identified pain in the entire region (*e.g.,* L3-S1 or C3-C7) and described the pain in general terms such as "referred to the lower extremity" or "referred to the bilateral buttocks" without any accompanying detail such as *which* lower extremity (*e.g.,* right knee, left ankle, left big toe). For example:

    a.      Patient TP (Claim No. 32-B238-9F9) complained of neck pain and a physical examination by Kotkes purportedly revealed bilateral pain in multiple regions

---

[1] The Treatment Summary includes only a portion of the claims at issue. For a full listing of claims at issue please see Damages Summary, attached as **Exhibit 2**.

(C3-C7).

b.      Patient DW (Claim No. 32-B437-7Q7) complained of cervical spine pain and the initial examination by Kotkes purportedly revealed bilateral pain in multiple regions (C3-C7).

c.      Patient RA (Claim No. 32-B210-0X4) complained of lumbar and cervical spine pain. The initial examination by Kotkes did not identify the problematic level of the cervical spine and noted bilateral pain in multiple regions of the lumbar spine (L3-S1).

d.      Patient SB (Claim No. 32-5349-T60) complained of neck and low back pain. The initial examination by Kotkes noted bilateral pain in multiple regions of the cervical spine (C3-C7) and left-sided pain in multiple regions of the lumbar spine (L3-S1).

e.      Patient TS (Claim No. 32-6499-C03) complained of neck and low back pain. The initial examination by Kotkes purportedly revealed bilateral pain in the multiple regions of the cervical spine (C3-C7) and bilateral pain in multiple regions of the lumbar spine (L3-S1).

f.      Patient AM (Claim No. 32-B866-0M7) complained of lower back pain. During the initial examination, Dr. Kotkes noted bilateral pain in multiple regions (L4-S1).

*See* Medical Records of Patient TP (**Exhibit 3**), Patient DW (**Exhibit 4**), Patient RA (**Exhibit 5**), Patient SB (**Exhibit 6**), Patient TS (**Exhibit 7**) and Patient AM (**Exhibit 8**), copies of which are attached hereto.

37.      Dr. Kotkes also claimed the majority of the Patients' pain levels were "constant"

in an attempt to justify the severity of the purported injuries, as well as the urgency of the treatment recommended.

38.　　Such uniformity of generic symptoms and observations is not credible in light of the vast differences in the Patients, each Patients' unique medical history and background, and the nature and severity of the injuries sustained.

39.　　Pinpointing and recording the precise location(s) of a patient's pain, as well as whether the pain is localized or radiating—and specifically where the pain is radiating—is critical to create an appropriate treatment plan for the patient with targeted and medically necessary treatment options designed to improve the patient's condition. Accordingly, this specific clinical information is a necessary prerequisite before the administration of injections and surgical procedures.

40.　　Kotkes also diagnosed 99% of the Patients with radiculopathy in either the lumbar or cervical region, or both, which was paired with a corresponding diagnosis of "intervertebral disc displacement" in the corresponding region. Disc displacement, often referred to as a herniated disc or disc protrusion, occurs when part of the disc gets pushed into the spinal canal.

41.　　Radiculopathies at one or more levels are rare in motor vehicle accident victims—even where there is a positive disc herniation. According to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the American Association of Neuromuscular & Electrodiagnostic Medicine, at most, only 19% of accident victims suffered from radiculopathy. Since the aforementioned study was conducted at a major university teaching hospital, the accident victims upon which it is based likely represented a more severely injured

group of patients than the Patients purportedly treated by Kotkes. Nonetheless, Kotkes reported that nearly every patient (99%) had generic or non-specific radiating pain without any indication in the medical records that would support such a finding or medical diagnosis.

42.     Kotkes did not link the specific anatomic location of the Patient's radiating pain complaints and symptoms to a precise anatomic defect (*i.e.*, "right L5 radiculopathy" or "right L4-L5 disc herniation"). For example, Kotkes diagnosed Patient TP (*supra*) (Claim No. 32-B238-9F9) with cervical radiculopathy and a corresponding cervical intervertebral disc displacement without specifying the cervical regions to which this diagnosis applied. Likewise, Kotkes diagnosed Patient AM (*supra*) (Claim No. 32-B866-0M7) with lumbar radiculopathy and a corresponding lumbar intervertebral disc displacement without specifying the lumbar regions diagnosed. *See* Medical Records of Patient TP (**Exh. 3**) and Patient AM (**Exh. 8**).

43.     This necessary clinical information is a prerequisite for the administration of injections and/or surgical procedures because spinal procedures should be directed to a specific spinal region.

44.     Instead, Kotkes recorded these pre-determined and non-specific radiculopathy diagnoses to fabricate the severity of the Patients' injuries and to justify advancing the Patients beyond conservative treatment to medically unnecessary interventional pain management procedures (*i.e.,* injections, surgeries).

45.     Following the documentation of generic patient pain complaints, Kotkes purportedly performed three separate orthopedic tests (compression test, Spurlings test, and straight leg raise test)[2]—the vast majority of which generated positive results. The generic

---

[2] *Compression Test* - with patient in a seated position, the examining physician forcibly presses downward and laterally on the patient's head, applying downward pressure on the vertex of the skull. The test is positive if pain radiates down the arm. A positive test means pain in the shoulder or upper arm on the same side to which the head is tilted. A positive test may indicate a pinched nerve in the neck (cervical radiculopathy) and greatly reduces the probability of

complaints coupled with the uniformly positive orthopedic tests resulted in Kotkes "diagnosing" Patients with uninformative generic and non-specific disc injuries at unknown disc spaces, such as the following:

```
Myalgia (M60.9)
Cervicalgia (M54.2)
Cervical Radiculopathy (M54.12, M54.13)
Cervical Intervertebral Disc Displacement (M50.20)
Low Back Pain (M54.5)
Lumbar Radiculopathy (M54.16, M54.17)
Lumbar Intervertebral Disc Displacement (M51.26)
```

46.     The Initial Reports also included boilerplate pre-determined causality statements concluding each Patients' injuries were purportedly caused by the respective car accident at issue and assigning nearly all Patients for whom a prognosis was given (98%) a "Guarded" prognosis regardless of the mechanism of injury, patient medical history, or other individual characteristics:

```
Prognosis is guarded


Causal Relationship:
Based on my history, physical examination, review of diagnostic testing and of available medical records,
patient's injuries, limitations, restrictions, to a reasonable degree of medical certainty, are causally related to the
the accident of 11-01-2019
```

47.     Based on the wholly inadequate and vague initial evaluation and testing performed—including the absence of any meaningful details concerning the mechanism of injury—it is not credible that Kotkes would have sufficient information to conclude (on the first visit) that every Patient's condition was "casually related" to the at-issue automobile accident. Instead, Kotkes included such boilerplate and predetermined prognoses and causal statements in

---

other conditions, such as muscle tension, as a source of pain.

*Spurlings Test* - Similar test for cervical spine nerve root compression, causing neck and arm pain. With patient in seated position, the examining physician forcibly presses downward and laterally on the patient's head, applying downward pressure on the vertex of the skull.  If positive, there should be pain in the upper arm or shoulder on the side to which the head is tilted.

*Straight Leg Raise Test* - is used to reproduce radiculopathy for patients with lower back pain.  With patient seated upright, the patient is asked to extend one leg at a time and then both legs. This test is positive and indicative of disc involvement if pain is produced or aggravated. A positive result for leg pain may indicate radiculopathy, interventricular foramen encroachment, space-occupying lesion, or nerve root tension, while a positive result for local back pain typically indicates lumbar ligament sprain or muscle strain.

the Patients' medical records to justify the prescription of medically unnecessary treatment.

*ii. Failure to Document Prior or Concurrent Conservative Care*

48.     Kotkes did not evaluate each Patient's prior conservative treatment as would be expected in a legitimate treatment setting. Review and documentation of prior conservative care is essential to determine, for example, how a patient responded to (or did not respond to) certain treatments directed at specific body regions (*i.e.,* patient had pain when doing physical therapy on the lumbar region) and whether the patient is an appropriate candidate for a specific interventional treatment. None of the Initial Reports contained this information. Kotkes neither noted prior or concurrent providers, nor noted the types of conservative treatment rendered by any prior providers. Kotkes also failed to include any information in the Initial Reports concerning the Patient's: (1) length of physical therapy, chiropractic or acupuncture treatment; (2) the types, dosage or duration of anti-inflammatory or pain medication taken by the Patients or any success exhibited by the intake of medication; or (3) whether the Patients positively responded to any specific portion of the prior conservative treatment. When asked about the absence of this critical information, Dr. Kotkes testified, "it is not important to note a prior or concurrent provider or the types of conservative treatment rendered by such provider before recommending surgery, the only prerequisite to take into consideration is that the patient is in pain." *See* 11/4/20 Examination Under Oath of Dr. Kotkes ("Dr. Kotkes EUO"), at 81:2-82:23, a copy of which is attached hereto as **Exhibit 9** (testifying it is not important to understand the type of physical therapy a patient received and that if "they still have pain, then that would be enough information" to proceed to surgery).

49.     Kotkes also had no procedure for staff to obtain emergency room records or prior diagnostic studies to assist in evaluating Patients' complaints and potential treatment options. For

example, Patient RA (Claim No. 32-B210-0X4) was suffering from radiating neck pain. Patient RA had electrodiagnostic studies on 10/9/19 suggesting possible right "C5-6" radiculopathy and an MRI of the right shoulder a week later on 10/15/19 reporting joint effusion (a swollen joint), biceps tenosynovitis (inflammation or irritation), and possible adhesive capsulitis (frozen shoulder). A review by Kotkes of the electrodiagnostic findings or the MRI of the shoulder prior to or at the 12/19/19 clinic visit would have explained the radiating neck pain was likely caused by the injured shoulder, obviating the need for *spinal* surgery and triggering a different, shoulder-centric course of treatment. However, the Initial Report did not reference either the electrodiagnostic findings or the MRI. Instead, on January 2, 2020, Kotkes proceeded directly to two surgical procedures: a "percutaneous discectomy" and IDET at C4-5 and C5-6. *See* Medical Records of Patient RA (**Exh. 5**).

50.     Likewise, Patient DW (Claim No. 32-B437-7Q7) was suffering from right shoulder pain. Patient DW had an MRI of the right shoulder on 10/7/19, which revealed a partial tear of the supraspinatus tendon (back of the shoulder), biceps tenosynovitis (inflammation or irritation), and anterior labrum tear (shoulder ligament injury). Patient DW had an EMG on 10/23/19 which reported a possible right C5-6 radiculopathy, as well as possible ulnar neuropathy and possible carpal tunnel syndrome. Again, Dr. Kotkes' evaluation on 10/28/19 failed to note either the EMG findings or the shoulder MRI. Had they been reviewed, Dr. Kotkes would have seen the causes of the reported right shoulder pain resulted from the multiple shoulder/biceps injuries and likely avoided surgery on the spine. Instead, these findings were not reviewed or documented and Dr. Kotkes performed a "2 Level Cervical Discectomy Elliquence" (*i.e.*, percutaneous discectomy) on C4-5 and C5-6, and IDET on 10/28/19. *See* Medical Records of Patient DW (**Exh. 4**).

51.     Even though Kotkes admittedly did not evaluate or consider prior conservative treatment rendered to a particular Patient, Kotkes nonetheless included a boilerplate and unsupported statement in the Initial Report stating conservative care had not been effective—evidencing the unreliable and fraudulent nature of Kotkes' medical records:

> **Plan:** The history and physical examination findings correlate with the diagnostic testing results for this injury. Conservative treatment to date has not resulted in a return to pre-injury status. MMI (Maximum medical improvement ) has not been reached. I therefore recommend the following Interventional pain management

52.     Without any analysis or consideration of the Patients' prior conservative care, the initiation of interventional pain treatment, including any injections and surgeries, is medically inappropriate and was not done to assist Patients in reaching their pre-accident status, but rather was employed to generate significant income to Kotkes for medically unnecessary and, at times, contraindicated procedures.

### B.     Kotkes' Medically Unnecessary Interventional Procedures

53.     Pursuant to the Treatment Protocol, after the above-referenced initial examinations, Kotkes immediately recommended the same combination of interventional treatment methods for nearly all Patients, including ESIs (99% of patients), trigger point injections (99% of patients), and either a cervical percutaneous discectomy and/or lumbar percutaneous discectomy (95% of patients):

> improvement ) has not been reached. I therefore recommend the following Interventional pain management procedures which are expected to improve functional capacity, activities of daily living, work related activities, physical examination findings including spine range of motion, motor and sensory deficits, and pain complaints;
>
> Lumbar discectomy and annuloplasty, percutaneous
> Cervical discectomy and annuloplasty, percutaneous
> Epidural Injections
> Trigger point injections

54.     The medical necessity of these treatments in such a large percentage of Kotkes' patient base is not plausible because, as described above, the types of injuries suffered by the at-issue Patients often heal without any intervention or treatment; are corrected through conservative

care such as pain and/or anti-inflammatory medications, time, physical therapy, or chiropractic treatment; or patient improvement is reached through the use of epidural injections. Only a small percentage of patients (<25%) who fail to improve through the aforementioned treatment should be considered potential candidates for the interventional treatment Kotkes recommended to nearly every Patient. Further, Kotkes gave these recommendations to Patients regardless of whether the Patients responded to conservative care and regardless of the results of the physical exam, MRIs, and electrodiagnostic studies.

55.     For example, Patient RA (Claim No. 32-B210-0X4), a patient with no history of back problems, was in a motor vehicle accident on 8/18/19. Kotkes conducted an initial examination of the patient on 10/2/19 after only six weeks of conservative care (acupuncture, PT anti-inflammatory medication and chiropractic treatment), and immediately recommended cervical and lumbar percutaneous discectomies, epidural injections and trigger point injections. Kotkes went on to perform a percutaneous discectomy and IDET on the lumbar spine only eight days later (10/10/19) without first waiting to see if conservative care was effective or administering any type of injection therapy.

56.     The uniformity of the treatment recommendations across hundreds of Patients—without medical justification—reveals the treatments were not part of an individualized treatment plan and Kotkes did not perform the treatment because it was medically necessary, and as a result, the treatment was not legitimately or lawfully provided. *See* Treatment Summary (**Exh. 1**). Rather, the initial evaluation and supporting documentation was designed to make it appear all Patients were suffering from radicular pain that had not resolved through conservative care—when no such evaluation was performed. Thus, the following elective interventional procedures performed by Kotkes were not indicated, related to the accident, reasonable, or medically

20

necessary.

### C. Kotkes' Medically Unnecessary Percutaneous Discectomies

57.     A percutaneous discectomy is a surgical procedure for patients with radicular pain stemming from a contained disc protrusion (nucleus pushes against the disc, through the annulus and causes the disc to protrude into the spinal column), which is a specific type of disc herniation. A percutaneous discectomy is performed by placing a needle into the middle of the problematic spinal disc and removing a small amount of disc tissue to create empty space inside the disc to allow the disc to collapse on itself (*i.e.,* allow the disc to decompress). In total, a single disc procedure performed by an experienced medical practitioner takes between 10 and 30 minutes from the time the needle is inserted until the time it is removed.

58.     Material from the periphery of the disc is not removed during this procedure and given that the only part of a disc that can be in direct contact with and compress the spinal nerve (thereby causing pain) is the periphery of the disc, percutaneous discectomy has not been universally recognized by the medical community to result in any meaningful decompression or pain relief.

59.     Candidates for percutaneous discectomies should first be treated conservatively to alleviate the pain through the use and combination of pain and anti-inflammatory medication, physical therapy, chiropractic treatment, and time. Patients who fail to respond to conservative care may become candidates for epidural injections. If the pain persists ten to fourteen days after the administration of an epidural injection (the time in which improvement, or lack thereof, would be exhibited), then a percutaneous discectomy may be indicated if both the stringent clinical and radiographic criteria are met. "Clinical" consists of the existence of radicular back pain (*i.e.*, pain radiating down the leg with or without localized back pain). "Radiographic" consists of focal disc

herniation in a location corresponding directly to the radicular pain.

60.     Percutaneous discectomies are less indicated in the cervical spine than in the lumber spine because the anatomy of the cervical spine and of the cervical discs themselves makes percutaneous access riskier. Thus, cervical percutaneous discectomy surgery is a high risk, low reward procedure that should rarely be performed and only in the most unique of patient circumstances. Nevertheless, Kotkes regularly recommended and performed percutaneous discectomies on the cervical spine, with at least 33% of the at-issue Patients having received a cervical percutaneous discectomy. These percutaneous discectomies were often performed with the assistance of Robert Robenov, P.A.

61.     Kotkes performed both lumbar and cervical percutaneous discectomies without satisfying the requisite clinical and radiographic criteria. As explained above, Kotkes does not specify the anatomic location where the surgery will be performed or connect the spinal level being operated on to a precise anatomic defect—such as right L3 radiculopathy due to a right L3-L4 herniation. To justify the surgical procedures, Kotkes (incorrectly) claims there is no way to know the location of pain until surgery is performed. But, percutaneous discectomies should never be ordered without first identifying and defining the levels on which the surgery is to be performed *prior to the procedure*.

62.     Kotkes also regularly scheduled Patients for both cervical and lumbar percutaneous discectomy procedures in an unnecessarily compressed time frame following the initial examination—despite the absence of documented medical reasoning—without any documented exhaustion of conservative care, and before the Patient had time to recover from any epidural or trigger point injections to determine whether they were effective.  For example,

a.     Patient AM's (Claim No. 32-B866-0M7) percutaneous discectomy procedure

22

was performed on 12/23/19, only 12 days after the initial examination. Kotkes' records do not support the need for this surgical procedure. The physical therapy and chiropractic records remained nearly identical from the date of the accident (10/22/19) to the date Patient AM was first seen by Kotkes (12/11/19). The physical therapy records consistently documented the patient "Tolerated TX Well" and was making "Fair" progress. The chiropractic records consistently documented the patient "tolerated TX well," that the patient's condition stayed the same, and the pain level decreased from a 9 to a 7 (three days before Kotkes' initial exam). Thus, the patient appeared to be getting better and the percutaneous discectomy was not medically necessary at the time it was performed. *See* Medical Records of Patient AM (**Exh. 8**).

b.   Patient KV (Claim No. 30-6830-K49) was first seen by Kotkes on 9/19/19, and proceeded to undergo a series of injections and surgical procedures within a 5-6 week span, without sufficient time between each procedure to evaluate their effectiveness. Lumbar trigger point injections and epidural steroid injections were performed on 9/26/19. One week later (10/3/19) Kotkes performed a lumbar percutaneous discectomy. Kotkes performed cervical trigger point injections and epidural steroid injections only one week after that (10/10/19), and performed a cervical percutaneous discectomy two weeks later (10/28/19). Kotkes did not document the specific spinal levels injected, rendering Kotkes incapable of tracking where each procedure was performed and which procedures were effective (or ineffective) for the treatment of the pain complaints. Kotkes also performed the procedures too close in time to be

effective in treating the Patient's pain complaints as not enough time was given to determine if the injections were effective prior to proceeding to percutaneous discectomy surgery. *See* Medical Records of Patient KV, copies of which are attached hereto as **Exhibit 10**.

c.     Patient TP (Claim No. 32-B238-9F9) received the same treatment plan (*supra*) on 10/28/19, yet  this patient proceeded directly to cervical percutaneous discectomy the same day. There is no documentation in the records justifying the need for a percutaneous discectomy on the first date of service. *See* Medical Records of Patient TP (**Exh. 3**).

63.     Dr. Kotkes also testified he performs percutaneous discectomy on patients who exhibit large herniations (more than 6-8mm in size). *See* Dr. Kotkes EUO, at 133:6-134:18 (**Exh. 9**) (testifying the size of disc herniation does not matter when performing a percutaneous discectomy). A herniation this size necessitates open surgery and is a contraindicator for a percutaneous discectomy. The reason large herniations are not designed or proven to benefit from percutaneous discectomies is because a physician is unable to remove sufficient content from the middle of the disc (via percutaneous discectomy) to cure a large herniation, and cutting out the protruding gel-like nucleus (via open surgery) would be the only effective means of removing the problematic material. Further, percutaneous discectomies are not intended to treat a bulging disc (where the annulus remains intact), but rather are only a (potential) treatment for a contained disc herniation (where the nucleus pushes through annulus and squeezes out of the disc). Nevertheless, Dr. Kotkes testified he regularly performs percutaneous discectomies on bulging discs. *Id.*, at 183:4-7 (**Exh. 9**) ("Q. Do you perform percutaneous discectomies on patients that have bulges as opposed to herniations? A. Yes"; later testifying that he performed a percutaneous

discectomy on a patient's bulging disc).

64.     In addition to improperly recommending and performing percutaneous discectomies, Kotkes also submitted bills for percutaneous discectomies that were fraudulent and misleading.

65.     According to  the American Academy of Professional Coders, CPT Codes 63075 and 63076[3] describe traditional/open discectomies, and CPT Code 62287 applies only to percutaneous discectomies performed on the lumbar spine. There is no CPT Code for a cervical percutaneous discectomy, and as such, a cervical percutaneous discectomy should be billed using an unlisted procedure code 64999 (unlisted procedure, nervous system).

66.     Instead of properly billing for cervical percutaneous discectomies using CPT Code 64999, Kotkes billed using CPT Codes 63075/63076—which represent an open spine (or traditional) discectomy procedure, not a percutaneous (or non-invasive) discectomy procedure. Traditional/open discectomies are used for true surgical  decompression with direct visualization. Traditional/open discectomies are invasive and completely different than the procedures actually performed by Kotkes. In a traditional/open discectomy, the surgeon decompresses the nerve roots/spinal cord by removing the herniated portion of the disc. Grafts are used to fill the empty space created by the removal of the disc. After removing the disc materials and relieving the pressure, the doctor closes the wound in layers. Traditional/open discectomies may involve inpatient hospital stays while percutaneous discectomies are typically an outpatient procedure. Accordingly, the surgical decompression procedures defined by CPT Codes 63075 and 63076 are completely different procedures than the cervical percutaneous discectomies performed by

---

[3] CPT Codes 63075 (discectomy, anterior, with decompression of spinal cord and/or nerve root(s), including osteophytectomy (*i.e.,* and open discectomy)) and CPT Code 63076 (UnderAnterior or Anterolateral Approach for Extradural Exploration/Decompression Procedures on theSpine and Spinal Cord).

Kotkes.

67.    Because CPT Codes 63075 and 63076 represent more complicated and serious traditional/open discectomies, they must be billed appropriately. Kotkes' practice of intentionally billing for more complicated procedures that were never performed was misleading and fraudulent, inflated Kotkes' bills, and caused Plaintiffs to overpay for the procedures performed on the at-issue Patients.

68.    Further, when billing for lumbar and cervical percutaneous discectomies under CPT Codes 62287 (lumbar) and CPT Codes 63075-63076 (cervical), Kotkes also often bills for IDETs (CPT Codes 22526 & 22527) and diagnostic procedures that are not actually being used as diagnostic tools to advance the Patient's treatment (CPT Code 62290 for discographies and CPT Code 72275 for epidurographies). All of these procedures are described more fully below.

### D.    Kotkes' Medically Unnecessary Discographies (a/k/a Discograms)

69.    A discogram is an invasive procedure used to ascertain if a disc is symptomatic and responsible for the pain reported by the patient.

70.    A discogram provides a radiographical evaluation of the integrity of the nucleus and annular rings to determine tears or other lesions that could be the cause of low back pain. This procedure should be performed diagnostically for the purpose of obtaining information to help determine whether to perform a percutaneous discectomy, not merely in  conjunction with one as a matter of course.

71.    A lumbar discogram evaluates disc pathology in persons with persistent, severe pain and abnormalities on MRIs—where other diagnostic tests have failed to reveal clear confirmation of a suspected disc as the source of pain. Lumbar discograms should only be considered for patients who, despite extensive conservative treatment, have disabling lower back

pain, groin pain, hip pain, and/or leg pain.

72.    To perform a discogram, a needle is inserted into the center of a spinal disc (using fluoroscopic guidance to ensure the needle is accurately placed) and radiographic contrast dye is injected followed by computed tomography to examine the disc abnormality.

73.    A discogram should be performed using control injections at the adjacent levels to make certain they do not reproduce the same pain. Three discs (including control discs) should be injected and included on a study to be completed contemporaneously by the physician performing the discogram.

74.    When performing a discogram, each disc should be "pressurized" slowly one at a time with a manometer to evaluate any pain reproduction. Pressurization consists of injecting small amounts of a sterile liquid (usually contrast material or x-ray dye) into the center of the disc. After each level is pressurized, pictures are taken with the fluoroscopic unit and the needles are removed.

75.    During a discogram, the patient is awake and alert so he or she can report any pain or pressure experienced from the injection. A normal disc should not cause pain when injected. If the injection recreates the patient's back pain, that disc is verified as the pain source (a positive result), so long as control injections at the adjacent levels do not reproduce the same pain. A negative result occurs when the discogram causes no pain or only mild pressure, indicating the disc is not the source of the pain.

76.    The medical utility of a discogram is heavily debated, with a portion of the medical community of the opinion that pain provoked by a discogram performed on a normal appearing disc (on MRI) was likely due to increased pain sensitivity and false positives. Such an invasive procedure should not be utilized to identify problems that could best be treated with

conservative management.

77.      Regardless of the medical efficacy of the treatment, when Kotkes purports to perform and bill for a discogram, it is done improperly, misleadingly, and with the intent to defraud Plaintiffs.

78.      Dr. Kotkes testified he does not pressurize discs with a manometer when performing discograms. *See* Dr. Kotkes EUO, at 141:24-142:15 (**Exh. 9**) ("Q. Aren't you supposed to, with a discogram, record the pressurization of the disc with a manometer? A. No."). However, pressurization through the use of liquid is necessary to mimic the pain patients with injured discs experience. Further, the use of the contrast material in conjunction with pressurization allows for an examination of the internal structure of the disc.

79.      Dr. Kotkes also testified he does not utilize control discs when performing this procedure. *Id*. at 145:2-7 (acknowledging control discs should be used "when possible," but that he does not use them). Kotkes simply injects iodine into the disc without the use of manometer and uses x-rays to see where the contrast leaks in order to purportedly identify tears.

80.      Dr. Kotkes admitted discograms have "limited value" that he thinks they have "very low and very, very limited applicability," yet he also testified he performs a discogram immediately prior to all cervical and lumbar percutaneous discectomy procedures as a matter of course. *Id*. at 150:3-8; 151:4-15.

81.      There is no evidence in the medical records that Kotkes actually performed discograms or that any diagnostic information was obtained by simply injecting contrasting material in conjunction with a scheduled percutaneous discectomy.

82.      Kotkes' procedure reports also reveal a failure to document any patient responses to the discograms. Thus, Kotkes did not perform a discogram in an effort to diagnose the location

of each Patients' disc pain or to assist Kotkes in performing a percutaneous discectomy, but rather, performed the procedure as a matter of course to increase the billings to Plaintiffs.

83.     As a result of the foregoing, Kotkes' purported performance of discograms failed to produce any relevant information for patient diagnosis and was not a compensable procedure.

### E.     Kotkes' Medically Unnecessary Epidurographies (a/k/a Epidurograms)

84.     An epidurography is performed to assess the structure of the epidural space in the spine. This outpatient procedure is done (without sedation) before epidural steroids are administered, to ensure accurate delivery of the therapeutic material to the pain source.

85.     To perform the procedure, a physician or radiologist uses x-ray-guidance (fluoroscopy) to insert a thin needle into the skin and directs the needle toward the epidural space at the desired location (*i.e.,* level) in the spine. Once the needle is inserted, the doctor injects dye. The x-ray allows the physician or radiologist to document the dispersion of the contrast dye, providing an outline of compressed nerve roots which enables the medical provider to make an informed diagnosis as to the source of pain.

86.     A physician can only bill CPT Code 72275 (epidurogram) if a separate diagnostic study is performed, including a permanent radiologic image of the epidural space along with interpretation and written report. The written report must support the medical necessity for the test and offer a description of the findings. For example, the written report should show the physician injected contrast into the epidural space under direct fluoroscopy for a diagnostic study. The report should also indicate the observed direction of the flow—noting any obstructions of the contrast dye in the space around the nerves—to help the medical provider diagnose compressive lesions, narrowing and swelling around the nerve or nerve roots, and/or intervertebral disc herniations.

87.     Mapping the epidural space to determine needle placement through the use of an epidurogram is not medically necessary each time a medical provider performs an ESI. However, Dr. Kotkes testified he purportedly administers epidurograms every time he performs an epidural injection as a matter of course and without appropriate medical justification. *See* Dr. Kotkes EUO, at 174:23-175:4 (**Exh 9**) (testifying "every time I do an epidural, I do an epidurogram").

88.     Further, Kotkes' documentation of the procedure was deficient. Kotkes did not indicate the specific levels on which epidurographies were purportedly performed on each Patient, but simply referenced the general location of the procedure (*i.e.,* lower lumber interlaminar rather than L3). Kotkes also failed to include any analysis of the results of the procedure:

> **Procedure:**
> Epidurogram was done in the AP and lateral projections. The epidurogram was performed at the low lumbar interlaminar space. Under continuous fluoroscopy, radiopaque dye were injected revealing medial spread of the contrast. The contrast spread cranially and caudally approximately one level.

89.     The above demonstrates Kotkes did not perform epidurographies as a medically necessary diagnostic test to aid in the Patient's recovery, but rather performs the test (if at all) to maximize Kotkes' charges to Plaintiffs.

### F.     Kotkes' Medically Unnecessary Intradiscal Electrothermoplasties

90.     An Intradiscal Electrothermoplasty (IDET) is a minimally invasive procedure once thought to treat low back pain caused by either a disc injury where the nucleus moved to the outer layers of the disc (thereby irritating the outer layers), or where nerve fibers that have grown out from the outer layers into the disc interior as a result of degeneration of the annulus. IDETs (or annuloplasties) use thermal energy to disrupt the nerve endings within the disc, destroy the nerve fibers and toughen the disc tissue, sealing any small tears.

91.     Before an IDET procedure, the patient is given a sedative and a local anesthetic.

Then, using fluoroscopy, a physician inserts a hollow needle containing a catheter and heating element into the disc, positioned in a circle in the annulus, and then slowly heats the needle. In total, a single disc procedure performed by an experienced medical practitioner takes approximately 25 minutes from the time the needle is inserted until the time it is removed.

92. IDETs have not been evaluated in large studies and there are no recent widely accepted peer-reviewed studies suggesting the treatment works. As a result, the vast majority of the medical community abandoned the procedure more than a decade ago.

93. In 2008, the Centers for Medicare & Medicaid Services ("CMS") issued a national coverage determination ruling IDET procedures are not reasonable and necessary for the treatment of low back pain performed on Medicare beneficiaries. Since that time, private insurance companies have adopted similar coverage recommendations, and it is not a commonly performed medical procedure for any indication or any patient. It is also not a covered procedure, and as such, hospitals largely do not perform the procedure.

94. Nevertheless, Kotkes performed IDETs on roughly half of Patients without medical justification in an effort to take advantage of the less stringent coverage/legal requirements of No-Fault Benefits' insurance and to maximize Kotkes' financial gain.

95. Dr. Kotkes testified he does not perform IDET as a standalone procedure, but rather, he purportedly performs the IDETs at the same time he inserts the needle into the patient's spinal disc during a percutaneous discectomy. *See* Dr. Kotkes EUO, at 164:6-15 (**Exh 9**) (testifying that for IDETs "it's just another additional procedure . . . I don't do it in and of itself, it's usually in conjunction with once the needle is in the actual disc . . . I don't do it independently . . . it's usually a secondary procedure for the discectomy."). However, the medical indications for percutaneous discectomies and IDETs render them mutually exclusive. If a patient has

31

radicular back pain and a focal disc herniation he/she may be a candidate for percutaneous discectomy, but not for IDET. If a patient has chronic and localized discogenic low back pain they may have been (a decade ago prior to the procedure being abandoned) a candidate for IDET, but not for percutaneous discectomy. As such, cases where both procedures are indicated would be non-existent, or at least extraordinarily uncommon. To the extent both are somehow indicated, the clinical rationale for such cases should be described in the records. Kotkes' medical records do not document the medical necessity of performing IDETs and percutaneous discectomies simultaneously.

96.     In total, approximately 96% of Patients on which Kotkes recommended percutaneous discectomies, also were recommended an IDET. Since 2017, Kotkes has performed hundreds of percutaneous discectomies in conjunction with an IDET to State Farm Insureds being billed using CPT Codes 22526 & 22527.

97.     Even more troubling, the length of the purported dual percutaneous discectomy and IDET procedures performed by Kotkes are not credible because they are implausibly short, raising doubts as to both the medical necessity of the procedures, as well as whether the procedures themselves were performed properly, or at all. While a percutaneous discectomy and IDET performed together would be expected to take approximately 35 minutes from the time of the first insertion to the time the last needle is taken out, the procedures administered by Kotkes all took less than 10 minutes, and some just 2 or 3 minutes:

     a.     Patient RA's (Claim No. 32-B210-0X4) lumbar percutaneous discectomy and IDET procedure took 2 minutes and the cervical percutaneous discectomy and IDET procedure took 6 minutes. *See* Medical Records of Patient RA (**Exh. 5**);

     b.     Patient SB's (Claim No. 32-5349-T60) lumbar percutaneous discectomy and

IDET procedure took 3 minutes and the cervical percutaneous discectomy and IDET procedure took 4 minutes. *See* Medical Records of Patient SB (**Exh. 6**);

    c.    Patient TS's (Claim No. 32-6499-C03) lumbar percutaneous discectomy and IDET procedure took 7 minutes. *See* Medical Records of Patient TS (**Exh. 7**);

    d.    Patient DW's (Claim No. 32-B437-7Q7) lumbar percutaneous discectomy and IDET procedure took 5 minutes. *See* Medical Records of Patient DW (**Exh. 4**).

98. In sum, Kotkes did not recommend or perform IDETs for these Patients because they were medically necessary, especially considering IDETs have no clear medical indication and are not a treatment for low back pain. Instead, Kotkes billed for IDETs to maximize Kotkes' charges to the Plaintiffs.

### G. Kotkes' Medically Unnecessary Injections

99. Kotkes subjected Patient to medically unnecessary ESIs and trigger point injections to maximize Kotkes' charges to Plaintiffs.

#### i. *Epidural Steroid Injections (ESIs)*

100. An epidural steroid injection (ESI) is a nerve block injection designed to target a specific nerve root and relieve radicular complaints (*i.e.*, radial pain) in the arm, shoulder, buttocks, thigh, or leg that results from a nerve root getting inflamed or pinched. ESIs are designed to treat discogenic pain that impacts a larger region or area (including the back) and are commonly used in legitimate pain management practices on patients who are appropriate candidates for the injection. Due to the risks presented by ESIs, they should only be performed when appropriate indications are present, and when medically necessary to diagnose and/or treat pain, to alleviate pain to facilitate conservative care, or to alleviate pain after conservative care has failed or is not an option.

101.     Prior to recommending and performing an ESI, a thorough physical examination must be conducted involving orthopedic and neurological testing. This testing is required to evaluate for associated sensory, motor, or reflex deficits in the involved limb(s), to help guide treatment, and to establish a baseline status before initiating an invasive treatment such as injections. The clinical findings and indications must be correlated with radiologic evidence of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain, and/or physical examination findings and that may be attributable to pathologies in and around the nerve roots.

102.     Here, Kotkes' cursory initial examinations and corresponding Initial Reports failed to document the reasoning behind advancing the Patients to ESIs or the medical necessity of the ESIs.

103.     As discussed above, the Patients' medical records lacked documentation concerning previous conservative treatment including prior/concurrent providers, the types of conservative treatment rendered by any prior/concurrent providers, the length of physical therapy treatment, the types, dosage or duration of medication currently being taken by the Patients or any success exhibited by the intake of medication. The "Assessment and Plan" section of the Initial Reports were so generic that they failed to detail what specific segments of the spine were involved and thus considered for ESI:

> improvement ) has not been reached. I therefore recommend the following Interventional pain management procedures which are expected to improve functional capacity, activities of daily living, work related activities, physical examination findings including spine range of motion, motor and sensory deficits, and pain complaints:
>
> Lumbar discectomy and annuloplasty, percutaneous
> Cervical discectomy and annuloplasty, percutaneous
> Epidural injections
> Trigger point injections

104.     There are several types of ESIs, each of which may be performed to relieve a patient's symptoms by introducing steroid medications into the epidural spaces surrounding the

vertebral levels at which the suspected pain-generating pathologies exist. Kotkes performed translaminar ESIs, which deliver anti-inflammatory medications directly into the epidural space (outermost part of the spinal canal) and therefore closer to the source of pain.

105. In total, at their first office visit, Kotkes recommended 99% of Patients with neck and/or back pain to receive ESIs.

106. As with percutaneous discectomies, an interventional procedure such as an ESI should never be authorized without defining the specific levels on which they were to be performed prior to the procedure (*i.e.,* L3-L4). However, Kotkes performs ESIs without specifying the anatomic location in which the injection would be performed (*i.e.,* connecting the levels to a precise anatomic defect). Instead, Dr. Kotkes testified the decision as to the type of injection and location, is made when the Patient is already in the operating room on the day of the procedure. *See* Dr. Kotkes EUO, at 120:14-25 (**Exh. 9**) (explaining "[t]ypically I'll decide in the operating room" what type of ESI to give the patient, "but most of the time, it's a translaminar epidural injection, and it doesn't have to be noted, as far as I'm concerned, exactly how the needle's going to be placed at this point."). Dr. Kotkes also testified he does not need to note what epidural space he injects because the medication will purportedly spread throughout the spine based on the movement of the patient. *Id.* at 186:4-187:6. This is simply not true. At best, medication injected into a lumbar spinal region would spread to an adjacent level, not throughout the entire spine.

107. Kotkes' procedure reports for ESIs are also insufficient in that they fail to document the specific location of the injections following the procedure, only generally indicating the procedure was performed in either the lumbar or cervical spine.

108. Likewise, follow-up reports do not always document the information necessary

to make a determination whether to advance to additional interventional procedures. If pain persists ten to fourteen days after the administration of an epidural injection—which represents the time in which improvement, or lack thereof, would be exhibited—only then would a percutaneous discectomy potentially be indicated. However, Kotkes recommends a multi-step treatment plan consisting of injections and percutaneous discectomies without properly evaluating the Patient's progress after each specific treatment.

109.     For example, Patient KV (Claim No. 30-6830-K49) was first seen by Kotkes on 9/19/19 and an epidural steroid injection was performed on the lumbar spine one week later on 9/26/19. The exact level of the spine (*i.e.,* L3 or L4) was not-specified on either the 9/19/19 or the 9/26/19 evaluations. A lumbar percutaneous discectomy was performed on 10/3/19. However, missing from Kotkes' 10/3/19 follow-up report was the medical reasoning for advancing Patient KV from an ESI to a percutaneous discectomy. In fact, the follow-up report reflects the Patient KV was improving by the date of the percutaneous discectomy. Patient KV had a pain level 8 on 9/26/19 and was down to a pain level 6 on 10/3/19. *See* Medical Records for Patient KV (**Exh. 10**). Insofar as Patient KV was improving, and only one week had passed since administering a lumbar ESI, additional interventional procedures should not have been performed at the time Kotkes performed the procedures (or potentially at all).

*ii.     Trigger Point Injections*

110.     Painful areas of muscle may contain trigger points, or knots of muscle that form when muscles do not relax. These trigger points may irritate the nerves around them and cause pain at the site of the trigger point or the pain can be felt in other parts of the body, including the back and neck.

111.     A trigger point injection involves inserting a needle into the muscle knot and

injecting medication into the affected area. The medication injected typically contains a local anesthetic and sometimes a corticosteroid, which is meant to anesthetize and relax the muscle in the trigger point, decrease inflammation, providing pain relief. Risks of trigger point injections include risks from the procedure itself, which involves inserting needles into patients, such as local and systemic infection, nerve injury, hematoma, pneumothorax, and local and systemic effects of the medications delivered. Moreover, even when performed correctly, any use of local anesthetic can involve risks, particularly in increased volumes, including central nervous system toxicity which can lead to seizures and cardiac toxicity which can lead to arrhythmia and even death.

112.     As such, a patient should be treated conservatively for several weeks or months and only after such treatment proves unsuccessful should a healthcare provider consider performing trigger point injections. Similar to the above-referenced interventional treatment, the trigger point injections Kotkes performed were prematurely ordered before allowing conservative care to take its course during the weeks/months following a motor vehicle accident.

113.     Here, the Patients' files lack documentation concerning previous conservative treatment including prior/concurrent providers, the types of conservative treatment rendered by prior/concurrent providers, the length of physical therapy treatment, the types, dosage or duration of medication currently being taken by the Patients or any success exhibited by the intake of medication. Indeed, some of the prior providers indicate palpable trigger points in the head and neck of the at-issue Patients, but Kotkes never reviewed the prior records to confirm whether the Patients' pain complaints were the same, had changed, or had improved, and thus, whether injection therapy was appropriate.

114.    Also missing from Kotkes' Initial Reports are the specific trigger points to be injected and medical reasoning for administering these injections. Instead, the "Assessment and Plain" section of the Initial Reports generally state "Trigger Point Injections."

> improvement ) has not been reached. I therefore recommend the following Interventional pain management procedures which are expected to improve functional capacity, activities of daily living, work related activities, physical examination findings including spine range of motion, motor and sensory deficits, and pain complaints:
>
> Lumbar discectomy and annuloplasty, percutaneous
> Cervical discectomy and annuloplasty, percutaneous
> Epidural injections
> Trigger point injections

115.    Medical reasoning for the administration of trigger point injections is also missing from the procedure reports themselves. For Para-Lumbar trigger point injections, the templated procedure report simply reads:

> **Procedure in Detail:** Ultrasound Imaging of the para-lumbar musculature in longitudinal probe orientation (in plane with muscle fibers)was performed.Imaging is necessary to avoid puncture of the lung, blood vessels spinal cord and to ensure the needle enters the muscles. Sono Palpation revealed expected compression/expansion as with skeletal muscle. Bursal and fluid effusion are totally compressible. Cystic entities are incompressible..
>
> Then, with Ultrasound guidance and sterile conditions a 27g needle was advanced in-plane, distal proximal to the intramuscular region identified as the myofasical trigger point.prepping and draping the area in the usual sterile fashion a 27 gauge was used to inject 1% lidocaine equally in the previously identified trigger points under ultrasound guidance.Gentle needling/fenestration of the muscle was employed to release fibrotic tissue and help to restore muscle function. There was no heme or paresthesias, nor air elicited from at any location (injections over lung areas). The patient tolerated the procedure well, all needles were removed intact.

116.    Similarly, the procedure report for Para-Cervical trigger point injections is also missing the medical reasoning for the injections:

> **Procedure in Detail**: Ultrasound Imaging of Trapezius, Rhomboid, Musculature in longitudinal probe orientation (in plane with muscle fibers) was performed. Imaging is necessary to avoid puncture of the lung, blood vessels and spinal cord to ensure the needle enters the muscles. Sono Palpation revealed expected compression/expansion as with skeletal muscle. Bursal and fluid effusion are totally compressible. Cystic entities are incompressible. Dynamic imaging with active muscle contraction demonstrated normal compressibility of the hypoechoic intrumuscular foci. Muscle tear or hematoma were not demonstrated.. . These were located at the Para-cervical musculature.
> Then, with Ultrasound Guidance and sterile conditions a 25g needle was advanced in-plane, distal to proximal to the intramuscular region identified as the myofacial trigger point. After prepping and draping the area in the usual sterile fashion a total of 1.0cc lidocaine 1% was distributed equally at each of the previously described sites previously identified trigger points under ultrasound guidance. Gentle needling/fenstration of the muscle trigger point was employed to release fibrotic tissue and help restore muscle function.

117.    As mentioned above, the procedure reports also reveal a lack of documentation of patient responses to injections. This information should be included so that concurrent

caregivers who treat the patient contemporaneously or subsequently are fully informed about the success or failure of the injections. This information is also critical to decisions about whether to subject patients to the risks of subsequent procedures. By failing to document this information, Kotkes exposed the Patients to unnecessary risks and rendered it difficult to determine whether the injections were actually benefitting the Patients.

118.    Further, the practice of administering both trigger point injections and ESIs on the same day is medically unnecessary because the purpose of a trigger point injection is to alleviate isolated back pain caused by muscle spasms and the spasm would be secondary to the underlying condition causing the pain, which the ESI is meant to treat. One procedure should be performed prior to the other, with time taken in between to determine if the first procedure improves pain prior to performing the second procedure. However, since 2017 Kotkes has subjected more than a hundred Patients to both sets of injections on the same date of service. The practice of subjecting Patients to both trigger point injections and ESIs on the same date of service is meant to inflate the billing rather than assist in patient recovery.

119.    With respect to billing for trigger point injections, Kotkes often inflated charges by representing they were performed using ultrasonic guidance, coupled with an additional charge under CPT Code 76942 ("Ultrasonic guidance for needle placement imaging supervision and interpretation"). Ultrasonic guidance should only be used as a safety precaution when injecting sensitive areas (*i.e.,* injections near organs, arteries, etc.). When injecting spinal regions there is nothing between the skin and muscle that needs to be avoided. As a result, needle placement for trigger point injections is a routine and fairly simple aspect of the procedure and it would be extremely unusual for ultrasonic guidance to be necessary to assist trigger point procedures. Nor do Kotkes' medical records document why such ultrasonic guidance was

necessary. Even if there were a clinical need for ultrasonic guidance, to bill CPT Code 76942 Kotkes must prepare a separate written report documenting why such ultrasonic guidance was medically necessary. However, Kotkes failed to submit these reports along with the Patients' files.

120.     In sum, Kotkes recommended and performed the treatments outlined pursuant to a Treatment Protocol, regardless of whether such treatments were medically necessary for the benefit of the Patient.

**V.     Plaintiffs' Reasonable Reliance on Fraudulent Submissions**

121.     Kotkes is obligated legally and ethically to act honestly and with integrity in connection with the billing Kotkes submitted, or caused to be submitted, to Plaintiffs.

122.     Despite this duty to act honestly, by submitting the bills and supporting documentation, Kotkes represented Kotkes actually provided the services billed and that the services were reasonable, related to the auto accident, and medically necessary. Kotkes then submitted each of the bills to the Plaintiffs to induce the Plaintiffs to pay.

123.     However, Kotkes' bills and supporting documentation were false, misleading, and fraudulent because they did not reflect actual treatments that were reasonable or medically necessary and in some instances omitted material information to induce Plaintiffs into paying for unreasonable and medically unnecessary treatments. As a result of Kotkes' false statements and omissions in the bills and supporting medical records  that Kotkes submitted to the Plaintiffs, the Plaintiffs paid for medically unnecessary and unlawful services. The services were part of Kotkes' predetermined Treatment Protocol created by Kotkes to maximize the financial benefit without regard to the Patients' individual needs.

124.     Plaintiffs are under statutory and contractual obligations to promptly process

claims within 30 calendar days after the insurer receives proof of claim, which shall include verification of all of the relevant information requested. *See* 11 NYCRR 65-3.8(a)(1); N.Y. Ins. Law § 5106(a). Kotkes' scheme was successful because of how precisely Plaintiffs are required to adjust No-Fault Benefits claims. Plaintiffs must adjust each claim on its individual merits within the 30-day time constraint outlined by New York law.

125.     Kotkes developed and implemented the fraudulent scheme to take advantage of Plaintiffs, knowing that the efficient operation of a system of insurance requires prompt processing of individual claims, and thus, Kotkes' scheme would go undetected unless claims, medical records, and bills were viewed in detail, reviewed collectively across the patient population, and compared to the records of the other Patients who were treated by Kotkes.

126.     Plaintiffs relied on the accuracy of the Kotkes' statements and representations in the medical bills that the treatments rendered were reasonable, related to the auto accident, and medically necessary.

127.     Plaintiffs did not, and could not, compare the medical bills and records from one claim to another or from one provider at the Kotkes Practice to another. Indeed, the time constraints imposed by New York law do not allow for any meaningful comparison. Instead, Plaintiffs have a right to rely on, and did rely on, Kotkes' representations that the treatments provided were reasonable, related to the auto accident, and medically necessary.

128.     The bills and supporting documents that Kotkes submitted directly to Plaintiffs in support of the fraudulent charges at issue were designed to, and did, cause Plaintiffs to justifiably and reasonably rely on them in processing payment for Kotkes' services.

129.     As a result, Plaintiffs incurred damages of more than $550,000.00 based upon Kotkes' fraudulent charges for services rendered from 2017 through the present.

130. Based on Kotkes' intentional misrepresentations and omissions to Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their payments to Kotkes were based on fraud until they reviewed the patterns reflected in the bills and supporting documentation Kotkes submitted to Plaintiffs, which revealed Kotkes' improper examinations, diagnostic procedures, injections, and surgeries.

131. The bills and supporting documentation submitted to Plaintiffs falsely represented that the services performed, including percutaneous discectomies, discographies, epidurographies, IDETs, and injections were recommended and performed because they were medically necessary and that the CPT Codes accurately described the services performed, when in fact the representations were false.

132. Kotkes fraudulently concealed their conduct by repeatedly submitting misleading bills and medical records that made it appear Kotkes was delivering legitimate medical care when considered in the context of a single patient's claim. In many instances the individual medical records and bills appeared to be legitimate because, as described above, Kotkes took steps to evade detection making it difficult to recognize the fraud. Kotkes diagnosed the Patients with purported injuries, intentionally omitted relevant information on medical history from their evaluations, and failed to record information and test results from Kotkes' documentation so as not to alert Plaintiffs.

133. It was not until Plaintiffs reviewed the bills and patient records over an extended period of time and began comparing the medical records/bills of Kotkes between multiple patients that the wrongful conduct became apparent and Plaintiffs began to suspect the individual claims were fraudulent and misleading. Only then did it become apparent that Kotkes was not providing legitimate medical care designed to address the Patients' actual injuries from auto accidents. The

submission of misleading bills and medical records were affirmative acts by Kotkes that prevented Plaintiffs from discovering the truth.

134.    Plaintiffs injuries were inherently unknowable because Plaintiffs believed they were paying what they owed. Plaintiffs processed and paid Kotkes' fraudulent claims in the normal course of business and did not suspect, and had no reason to suspect, Kotkes was engaged in a fraudulent scheme designed to improperly and unlawfully extract insurance benefits from Plaintiffs.

## FIRST CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202
### (Against All Defendants)

135.    Plaintiffs incorporate, adopt and re-allege as if fully set forth herein, each and every allegation in Paragraphs 1 through 134 above.

136.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

137.    An actual case and controversy exists between Plaintiffs, on the one hand, and Kotkes, on the other hand, as to Plaintiffs' obligations to pay Kotkes' unpaid bills (whether in whole or in part) for examinations, treatments, and services provided to Insureds/Patients treated by Kotkes that have not been paid to date and that are unpaid through the pendency of this litigation. The claims subject to the declaratory judgment count and the unpaid amounts are identified in **Exhibit 2 (Damages Summary)**.

138.    As described herein, Kotkes engaged in an intentional and fraudulent scheme to obtain insurance benefits from Plaintiffs. Instead of treating each Patient based on his or her individual needs, Kotkes engaged in a predetermined Treatment Protocol.

139.    Kotkes is not entitled to receive payment for any pending bills submitted by Kotkes to Plaintiffs because the examinations, diagnoses, treatments, and services provided by

43

Kotkes were not medically necessary, and were performed—to the extent they are performed at all—pursuant to a Treatment Protocol that served to enrich Kotkes.

140.     Because Kotkes made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to Plaintiffs, Kotkes is not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE Plaintiffs respectfully request a judgment declaring Defendants are not entitled to reimbursement for any of the unpaid charges for the examinations, diagnoses, and treatments provided to Insureds/Patients to date and through the pendency of this litigation.

<u>SECOND CAUSE OF ACTION</u>
**Common Law Fraud**
**(Against All Defendants)**

141.     Plaintiffs incorporate, adopt and re-allege as if fully set forth herein, each and every allegation in Paragraphs 1 through 140 above.

142.     Kotkes intentionally and knowingly made false and fraudulent statements of material fact to Plaintiffs and concealed material facts from Plaintiffs in the course of their submission of hundreds of fraudulent bills seeking payment for fraudulent services.

143.     The false and fraudulent statements of material fact and acts of fraudulent concealment include, in every claim, the representation that the services were performed because they were medically necessary for each unique Patient, and/or the expenses were necessary when, in fact, the services either were not performed or were performed pursuant to the Treatment Protocol designed to financially enrich the Kotkes, not because the services were medically necessary to treat the Patients.

144.     Kotkes knew or should have known the above-described misrepresentations made

44

to Plaintiffs relating to the purported examinations, diagnoses, and treatment of patients were false and fraudulent when they were made.

145.     Kotkes made the above-described misrepresentations and engaged in such conduct to induce Plaintiffs into relying on the misrepresentations.

146.     As a result of their reasonable reliance on Kotkes' misrepresentations, Plaintiffs have incurred damages of at least $550,000.00. *See* **Exhibit 2 (Damages Summary)**.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory damages, together with interest and costs, and for such other relief as this Court deems equitable, just and proper.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (Against All Defendants)

147.     Plaintiffs incorporate, adopt and re-allege as if fully set forth herein, each and every allegation in Paragraphs 1 through 146 above.

148.     As set forth above, Kotkes engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiffs.

149.     When Plaintiffs paid the bills and charges submitted by or on behalf of Kotkes for No-Fault Benefits, they reasonably believed they were legally obligated to make such payments based on Kotkes' improper and/or unjust acts.

150.     Kotkes was enriched at Plaintiffs' expense by Plaintiffs' payments, which constituted a benefit they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

151.     Kotkes' retention of Plaintiffs' payments for services that were not medically necessary, were not rendered, or were not reimbursable violates fundamental principles of justice,

equity and good conscience.

152.     As a direct and proximate result of the above-described conduct, Kotkes was unjustly enriched at Plaintiffs' expense in an amount to be determined at trial, but in no event less than $550,000.00. *See* **Exhibit 2 (Damages Summary)**.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory damages plus interest and costs, and for such other relief as this Court deems equitable, just and proper.

Dated:  June 17, 2022

**HOLLAND & KNIGHT LLP**

By: *<u>/s/ Matthew R. DiBlasi</u>*
    Matthew R. DiBlasi
    31 West 52nd Street
    New York, New York 10019
    Telephone: (212) 513-3200
    Facsimile: (212) 385-9010
    matthew.diblasi@hklaw.com

    *Attorneys for Plaintiffs State Farm Mutual*
    *Automobile Insurance Company and State*
    *Farm Fire and Casualty Company*